Good morning, and may it please the Court. My name is Cliff Gardner, and I represent the petitioner, Joshua Richter. I'm going to focus – actually, I'm going to reserve five minutes for about all I've been advised to keep my eye on the clock, and I will do so. And I'm going to focus my remarks today on two of the issues in the case, the ineffective assistance of counsel issue and the Brady issue that were the subject of the petition for rehearing. And as I'm sure the Court is aware from looking at the briefs, there are many areas that the Attorney General and I disagree on. And so I thought, because these issues are factually complex, in order to put them in context, I would start with three points that we actually agree on and that the District Court found. And the first of these points is that – and the District Court found this – the jury was presented with two very different theories of the case, from opening statements to closing ordinance. From the State, relying primarily on Gunner Johnson, the jury heard that Pat Kline was shot and killed on the couch, that Gunner Johnson did not fire a .380 caliber that night, and that the blood pool found in the living room – in the doorway between the living room and bedroom was from Gunner Johnson. From the defense, the District Court found, there was a very different theory on each of these three points. Pat Kline was not shot on the couch. He was shot in the doorway. Gunner Johnson did fire a .380 caliber that night. And the source of the blood pool was not Gunner Johnson, but Pat Kline. Counsel, I never understood how anyone could be certain about anything regarding whose blood was where and who was where when. And the reason why was it was 4 in the morning. I was trying to think about people at 4 in the morning. They probably were not rushing to get to the LAX airport. Most people at 4 in the morning, either they're asleep, you wake them up, they're too doped up from sleep to know exactly what's going on until they've had their coffee, or else they're drunk, or else they're high. If they're awake, they're probably high or drunk at that hour. How can there be enough certainty about whose blood is where and who is at what location in the residence for the claims of the opposing counsel to even matter? Well, I think – I don't disagree with you that when you look at this crime scene, it is difficult with, as Your Honor put it, with certainty to say whose blood is where. But ultimately, since this case came down to a credibility contest, which the judge also found, it was basically he said, he said. Joshua Richter gave an account of the incident. Gunner Johnson gave an account. No, it's not just he said, he said. It's circumstantial – a lot of circumstantial evidence, like the gun safe being in Richter's house instead of in Johnson's house. Well, Your Honor, his question actually hits right at the heart of this. Since it was he said, he said, it depended on the circumstantial evidence. And you're quite right. What the prosecutor did was realizing this was he said, he said. He presented circumstantial evidence that he believed supported his case. Of course, there was an explanation for the safe, and we can get to that. But the important part of this, or one of the important parts, is that the district court found defense counsel could have presented circumstantial evidence to support each of the three components of the defense theory. He could have presented circumstantial evidence to show that, in fact, that blood pool could not be Gunner Johnson's. He could have presented circumstantial evidence – Do you understand the thrust of my question on that is, so what? And the so what is this. If that Gunner – and this is probably one of the most important things I can say this morning. If that blood pool isn't Gunner Johnson's, the State's theory falls, if it's Pat Klein's. The prosecutor's theory falls, but the jury can read the instructions and decide, based on the evidence in the instructions, whether the defendant is guilty, even if they don't think the prosecutor understood the facts correctly. Well, I suppose that's possible, or I should say plausible, but it's likely that if the jury believes that the particular theory presented by the prosecutor in this case – and it was a relatively complex theory, it's a relatively factually complex case – if the State's theory doesn't hold water, the idea that they are unanimously going to find proof beyond a reasonable doubt that the defendant is guilty of the crime seems extremely unlikely to me. Does your theory – you keep saying that the blood pool was not Gunner Johnson. I understood your theory to be that it had to at least include some of Klein's blood, that it wasn't entirely Johnson, or is your theory that it's all Klein? No, it's not entirely – certainly, Pat Klein can't be excluded as the source of the gun pool and, in fact, is the primary donor. And here's why it's important. I know Your Honor asked, why does it matter? I'm sorry. I did not understand. I understood just – was it just Fisher who asked the question? It was. I understood the question, but I'm sorry. I did not understand the answer. Well, then I'm sorry. It's important, so perhaps you can try again? Yes, I will. Absolutely, I'll try again. Please. Thank you for giving me the opportunity. Yeah. Ultimately, our position is that Pat Klein is the source of that gun pool – I'm sorry, the blood pool. He's the primary source. That's part of what confused me. You said – you did say gun pool – the blood pool. So your view is that all of the blood was Klein's, or some of the blood was Klein's? It can't – almost all of the blood was Klein's. There has to be some of Gunner Johnson in there, too, if you accept the premise that the – and unfortunately, the police didn't take a sample of the blood pool itself. They took a sample of a splash of blood on a nearby molding. And that sample, the experts now say, Pat Klein can't be excluded, Gunner Johnson can't be included. So clearly, there has to be some mix of blood in that blood pool. Just to follow up, what evidence is there that Klein's blood was in that pool? In the actual blood pool, Your Honor? Yes. At trial, there was no evidence, and that's the problem. We now know that Gunner Johnson can almost certainly be excluded as being the source of that blood pool because of the blood spatter testimony. And it's not a particular – I'm sorry, did you say that Johnson can be excluded as the source of the blood? As the person who – the State's theory was that Gunner Johnson stood in the doorway and dripped into – Right. And I understood – and your theory is that Klein was shot and fell at that point. And I understood that the State's expert witness testified that the blood was exclusively Johnson's because of the 2 plus 1 plus reading. And I understood your witness to say that Klein's blood wasn't in there. Now I'm hearing you tell us that Johnson's – that it can't be Johnson's blood. And that's very different from what your expert testified. Well, let me try to explain it. The 2 plus 1 plus and the 1 plus findings aren't in the blood pool, Your Honor. They are in a splash taken from a door molding a foot away from the blood pool. And that's where the serology testimony comes in. Let's go back then to the question, I think it was from Judge Kaczynski. What evidence do we have at trial, or even afterwards, as to the identity of the blood in the blood pool? In the blood pool. And there are two different answers. At trial, there is no evidence. And the State's theory is, therefore, Gunner Johnson deposited that blood pool when he was standing in the doorway dripping into the blood pool. After trial, a blood spatter expert looked at that and said, it just isn't possible. If you drip into a blood pool, as the prosecutor has theorized, you have what's called satellite drops. It's not rocket science. If you have a pool of liquid and you drip into it, there are drops that will come out caused by the dripping into the blood pool. And in fact, if you look at the trial transcript, you will see the State's own expert, Detective Bell, when he's talking about entirely different blood pools, some in the kitchen, he talks about this satellite drop phenomenon. It's not a new phenomenon. It's very well accepted. And so after trial, the evidence shows that, in fact, that blood pool can't be explained the way the prosecutor explained it at trial. It just can't. And getting back to an earlier question, why does that matter? It matters for this person who's the source of that blood pool. It's Pat Klein. If Pat Klein is the source of that blood pool, he had to be moved to the couch. The State's theory falls. Gunner Johnson denied doing that, and yet we now know that Gunner Johnson can't be the person who is the source of that blood pool. There's no dispute about that. We went through federal habeas hearings. The district court offered the State an opportunity to depose our experts to present their own evidence, and I think largely because of Detective Bell's testimony about satellite drops at trial, they elected not to challenge the theory. And it's a basic theory. It's not like it was rocket science. Mr. Gardner, I wonder if I could change your focus just for a moment. Mr. Axop, in his opening statement, indicated that he would produce evidence that would show conclusively that Klein could not have been shot on the couch, and he specifically referred to blood tests. How do we know that his failure to testify or bring witnesses on, and for that matter, to gather scientific evidence about that, was not a strategic decision on his part? Well, I think, and my recollection may be slightly different of the opening statement. My recollection was that he said the evidence of greatest importance is the blood evidence, the blood pools, the blood spatter. And yet he presented no evidence. Exactly, and that's really the problem. It wasn't blood testing, because after all, none of the blood was collected. There was no testing to be done. There was no ABO testing, PGM testing, DNA testing couldn't be done because samples hadn't been taken. Okay, but to get back to my point again here, he made a big deal about this with the jury, and yet he presented no evidence, and yet, as you point out, if Klein's blood is in the pool, then the prosecution's theory of the murder, at least of Klein, could not be correct. Why didn't he do that? Well, when he was asked, he was asked at his deposition, why didn't you present blood spatter testimony? Why didn't you present the pathology testimony? And his answer was, he just didn't consider it. He was familiar with blood spatter testimony, he just didn't consider it. Why did he say something about it in his opening statement if he wasn't familiar with it? You know, it's an excellent question, and that really is the basis of our claim. To have presented this to the jury in opening statement, to have told the jury that the two were, I think he said, the items of greatest importance, or some language like that, and then not to have consulted with a blood spatter expert to talk about this garden variety theory that could have supported his case, fell below the standard of care. There was no tactical reason. Yeah, I've got to say, that's really my concern. I certainly understand your point that by not taking, by not doing the testing, not having an expert and so on, he fell below the appropriate standard under Strickland, but I have to deal with the issue of whether it was a strategic decision on his part. Was he thinking that he was going to get it from the prosecution? Is there any testimony to that effect? There's no testimony to that effect. He specifically asked, why didn't you do it? He said, I just didn't consider it. Clearly, he didn't have, he didn't make a tactical decision. And one of the interesting things is, once you accept and realize that the state did not collect any of the blood, so that you couldn't test it for ABO or PGM, then the only thing left in terms of analyzing the blood is to look at its appearance, which requires a blood spatter, I'm sorry, a blood spatter expert, or to look at the amount, which requires a pathology expert. And that's, of course, what was done in post-conviction. And counsel did neither of these things. Well, Mr. Gardner, I wonder if I could ask you about the Brady issue. Certainly. I understand Brady to require prosecution disclosure of what they have. If I understand the story correctly, they accurately and timely told you what their expert or what their witness, Mr. Maloney, would have said. They disclosed to you that he would say that he went out to the place, the bullet hole looked like a 22 to him. They disclosed to you that they took a picture of it. They disclosed to you that he says that he dropped it in the dirt and he can't retrieve it. I don't know why they haven't met their Brady obligation. There are other problems with it, I recognize, but I don't see where that's a Brady violation. Well, let me respond to that. And first, let me refer to, you mentioned there's other problems. Of course, it's also discussed alternatively as an ineffective assistance of counsel claim, because counsel didn't go out or send an investigator out to actually get the piece of floorboard at the time. Yeah, maybe it's newly discovered. Maybe it's other things. But, I mean, I don't see where that's a Brady violation. It's important to understand that ultimately either trial counsel can rely on that statement from Maloney, in which case the falsity of that statement, because we now know it's false. In fact, there's a, and it's in the excerpt of record at page 47, you can see the access port to the crawl space. So we know that Maloney's testimony, either he knew or should have known when he said there was no access to the crawl space. We know that he knew or should have known that was false. That's your Brady claim? Well, it's in combination of that and one other point. I wanted to just say that, so if counsel can rely on that, I mean, when they disclose stuff to you, that's not a guarantee that the witness is accurate. I mean, that's why you have a trial. Prosecutors disclose all the time, for example, that, you know, mental cases from prison, confess to Jimmy Hoffa's murder, they confess to this crime. You know, they disclose it. That's not a guarantee that it's true. They give you what they have. They said, this guy would testify this is what he did, you know, and they Absolutely. There's no guarantees in criminal trials or baseball. The point is, though, that there may not be a guarantee as to accuracy of the information, but when you say it fell into the crawl space, the crawl space is four feet high, and they say, well, did you get it? And Maloney says, well, the first thing we thought of, of course, was access to the crawl space. And unfortunately, the sighting comes all around the house, so there is no access. And that is false. Okay, but he's a dope. I mean, you've proven that, I mean, he drops the thing in the dirt to begin with, so he's Inspector Clouseau. Well, he may be Inspector Clouseau, but Inspector Clouseau presents certain problems for a prosecutor under Agers, under United States v. Agers, and under cases like Nepew and Miller, because a prosecutor has an obligation to correct false testimony. Testimony that the state should know, knows or should know is false. And Maloney certainly knew or should But the defense lawyer would have known just as well that it's false. I mean, who believes you can't retrieve something in a crawl space under a house? I mean, you can pull up the floorboards, you can saw the side of the house, I mean, I don't know, things in a house built in America where you can't get under there to get to the piping. I mean, it's, it's, it's It brings me right back to ineffective citizens of counsel. Yeah, I mean, but we're talking Brady. I mean, we have Well, you're giving us a choice, then. I am giving you a choice. Let me ask you It's like a smorgasbord? But I don't think I'm sorry? It's like a smorgasbord. Sure, A or B. And here's why I say that, because I actually agree. Once Maloney says it fell into the crawl space, there's a reason they call it a crawl space, and that's because you can crawl it. There's access to it, because as you say, there's piping, there's ventilation. For a defense counsel to have simply said, oh, it fell into a four-foot-high crawl space, okay, I won't even check it in this life-without-parole case. That falls below the standard of care. I agree. And ultimately, let me take a step back, because I do believe it falls below the standard of care, because I agree with Your Honor that, after all, it's a crawl space. That's what it's for. There's always access. I don't think the court Well, more importantly, it's, what's sitting on top is a house, not a mountain or a, it's not a gold mine, I mean, a mine shaft or something. It's a house. Houses can be taken apart. Even if there was no access to the crawl space, I would probably be here arguing that he had an obligation to somehow find a way in and get that With counsel, I Excuse me. Could I just follow up one thing? Why would you say that if they tell him it Well, because ultimately, defense counsel's theory, as promised to the jury in opening statement was, a .380 caliber was fired that night in the house. So, the prosecutor asked quite correctly in closing argument, a .380 caliber was fired? Where's the bullet hole? How can that be? Ladies and gentlemen of the jury, he said, you can reject the defense theory because there is no .380 caliber bullet hole. And the prosecutor was right. The defense theory depends on a MAC-12 .380 being fired that night. There has to be a bullet hole somewhere. And given that defense counsel made this a central part of his case, when they find a bullet hole in the floor, at that point, he says, okay, this is my .380. Your guy says he shot, he did a, he shot a hole in a .22 hole in the floor when he was cleaning his rifle. I'm sorry, it's not, it's not my guy. I mean, Johnson's Gunner Johnson explained it. And that actually makes it even more important to check because now, if it's a .380, not only have you supported the defense case, you've shown Gunner Johnson was lying about the caliber of that bullet hole. And we know both of those things are true now. Counsel, I, I still have trouble with the idea that the defense lawyer would actually want to know. The way he testifies in his deposition, when they went into the trial, when they started the trial, he knew that the government did not have all these blood experts and had not taken proper samples of the blood. On the .22, he knows that he's got somebody who dropped this piece of wood in the crawl space. Now, it's always struck me as overrated because if you're shooting at an intruder, the hole should be in the wall, not the floor. But regardless, he's now got two holes. The last thing you want to do if you think your guy is probably guilty is plug the holes. If you actually ascertain what the truth is, then it makes it really hard to tell the jury, gee, we don't know. There are all these holes in the investigation. They didn't do the right things with the blood, the spatter, the serology, the, they lost the evidence with the wood and the bullet hole. You have to have a reasonable doubt. It seems like when you come right down to it, either it's a home invasion robbery or they're going to somebody's house at four in the morning to bring over his pay and his clothes from work. The first seems more likely and having some smoke you can blow about things that the prosecutor hasn't done, it looks like a really good defense strategy. Well, you know, that may have been a decent defense strategy, but that wasn't the defense strategy counsel elected. I think it's what he says in his deposition that he elected. He says he saw a hole in the prosecution evidence. What he says in his opening statement is, ladies and gentlemen, I'm talking about his deposition, not what he says in his opening statement. Well, ultimately the assessment of Strickland is based on what he promised the jury, what his theory of the case was and what he didn't produce. Well, that's one thing. You get a lot of disappointments in trial. Well, you do. And sometimes the dynamics of trial can change after an opening statement and you may want to retrench on a position. He said he got a curveball in this case. That happens all the time if you get a curveball. But ultimately Strickland is about reasonable conduct. And here's what happens when you get a curveball. If your theory is, and you tell the jury an opening statement, a .380 was fired that night. Okay, that's your theory. You can get a curveball in trial and in fact the only bullet holes are a .22. A reasonable lawyer then has two options. One, you can change your theory because after all you got a curveball. Two, you can say, you know what, my theory is it's a .380. It's a .380. I've got to go investigate. I've got to show that this theory about it being a .22 is wrong and I'm going to stick with my theory. That's a reasonable course too. What defense counsel in this case did was he stuck with his theory. He told the jury in closing argument a .380 was fired and then he got skewered by the prosecutor because he hadn't investigated whether in fact it was a .380 caliber hole. That third alternative is not reasonable. There are many reasonable responses to a dynamic change of trial. Change your theory or go investigate. What counsel did here was he denied them. He stuck with his theory and then in closing argument. This strikes me as a case which must not be that uncommon of a lawyer who doesn't believe his client's story. You're a criminal defense lawyer? I am, Your Honor. I know you're a fine appellate counsel. It must happen from time to time. It has happened to me from time to time, Your Honor. So if you are in that situation and you think your client is lying to you, what is a reasonable thing to do? Why isn't perhaps a reasonable thing to do to say, well, I'm not going to follow up on any of these things because I truly think the guy is lying to me. And all that's going to happen if I pursue these possibilities is I'm just going to drive the nail in deeper. Yes. And I think there is a reasonable course of conduct that you take when you don't believe your client. And when you don't believe your client, you don't make an opening statement that is premised entirely on the factual allegations your client has given you. Because at that point, I can see there are many situations in which trial lawyers find themselves exactly in that position. You don't tell the jury an opening statement, exactly the theory you're going to present, and then simply abandon it. And then, in closing argument, come back to that theory without having done anything in between. Mr. Gardner, have you abandoned your Brady theory? It sounds like you're retreating on this 380 back to ineffective assistance of counsel. Are you still contending that the prosecution violated Brady by not producing the floor board with the 380? I am. I think this claim can be analyzed either as an ineffective assistance... Aside from Brady itself, what Supreme Court authority do you have that would sustain your position with respect to Brady and the obligation of the prosecution to produce the floor board in this particular case? I take it that the question really gets at the fact that, unlike many Brady cases, they didn't have this in their file. It's not a report that the prosecutor had in his file. This is a floor board that is in the crawl space, whether there's access or not. Following up on what Judge Silberman said, he outlined for you the things that the prosecution did which seemed quite reasonable under the circumstances. Now, we know after the fact that the floor board showed that it was a 380 hole. It was very important in the client's case. We know from an ineffective assistance of counsel perspective that's important. But on a Brady perspective, what more did the prosecution have to do in this case and what authority do you have for that proposition? Let me start with cases like Giglio and Kiles and Strickler for the general proposition that a piece of evidence, whether it's a report or a piece of evidence, doesn't have to physically be in the prosecutor's file for there to be constructive possession for Brady purposes. I know there's no scienter requirement, but are you saying that if the prosecution has no real idea that there's anything that would be helpful to the defense in this situation that it nonetheless has an affirmative obligation under Brady and its prodigy to get that floor board and check it out to be sure no matter what? Is that what you're saying? Well, now I understand the question more precisely. I suppose Bagley would be the case I would talk about, which says that, in fact, when we analyze materiality for Brady purposes, the question isn't only, okay, what exact information did the police have that they didn't give, but is there any adverse effect on the defense? We can consider, says Bagley. And that's as it ultimately comes out or as the prosecution understands it. No, that's a timing issue then. We now know it's important. They presumably didn't know it before, but you're saying that under Bagley there is an affirmative obligation of the prosecution in this case to get that floor board and produce it. Yes, I am. And the analogy I suppose I would give to establish that the prosecutor doesn't have to know at the time of the suppression of the materiality is a case where, for example, the prosecutor, unbeknownst to the prosecutor, biologic material is taken from the crime scene. The prosecutor has no idea, doesn't disclose it, absolutely in good faith. And it turns out that material is revealed after trial and DNA tests are done and it exculpates. Should that material have been disclosed? Yes. Is there a good faith problem? No. Brady doesn't require good or bad faith. Remember, there's a marvelous line, I think it's in Agers, where the court says what matters in Brady is not the character of the prosecutor, it's the character of the evidence. Suppose they got biological material and disclosed it and they say it inculpates, but it turns out it really exculpates. The witness is wrong, the lab made a mistake. Is that a Brady violation? Well, I'd like to reserve the rest of my time for Rebecca, but certainly answer the question. Your Honor's question said that they did disclose it, so... They disclosed what the lab told them. It turns out the lab was wrong. Is that a Brady violation? It would probably cross between Brady and the obligation to correct testimony that is false, that you know or should know is false, depending on the nature of the falsity. You're almost, you're way up below your five minutes. I want to give you time, but I want you to think of an answer to a question while you're sitting there. I understood your answer to one of the earlier questions to be almost that if an innocent man tells a lawyer I'm going to leave him, he has no duty to investigate. I'd like you to answer the question of whether it's the job of a defense lawyer to be a judge and to not check what his client tells him because he's decided he's not innocent. When you come back, please answer that question. Okay. I'm happy to answer it. If I misspoke, I'll straighten it out. Well, you didn't necessarily. I just asked the question. Was there anybody else with a question? Okay. Thank you. We'll reserve three minutes for a bottle. We'll hear from the State. Good morning, Your Honors, and may it please the Court. I am sure that you have a lot of questions to ask me before you start firing away. I think it's important for, I'd like you to just give me a brief moment to explain a few facts here. I want to state your name for the record. My name is Mark Johnson. I'm from the California Attorney General's Office. There's a few facts in this case that I'm not sure were developed sufficiently in the panel decision or in the district court and I think are critical in evaluating this claim of ineffective assistance of counsel. These facts, they all revolve around the central fact that the victim in this case, Mr. Klein, was shot and killed by two different weapons, a .22 caliber weapon and a .32 caliber weapon. We know that, of course, because those bullets were recovered from his body. We also know, there's no dispute in this case, that Branscom was the person who fired the .32 weapon. We know that he shot both Johnson and Mr. Klein with the .32 weapon. It's also undisputed in this case that Johnson, whatever his involvement was in this case, during the altercation, during the shooting, he never left his bedroom, never left the area immediately his bed and there's no evidence at all. I thought that he went out to take some marijuana plants somewhere. No, I'm talking about during the shooting itself. During the period of the shooting, there's no evidence that he ever left the area of his bed and there's no evidence at all that he possessed a .22 weapon or that a .22 weapon was shot in the bedroom area. Didn't he say that he shot a .22 caliber into the floor at some point and just misfired or practicing or something? Yes, but I'm talking about at the time of the shooting here. This happened sometime previously. There was no .22 weapon ever recovered from the house and there's no evidence that he even possessed a .22 weapon at the time. The evidence showed that, in fact, consistent with his injuries, two .32 cartridges were found in the bedroom. There were .22 cartridges recovered, but not from the bedroom. Consistent with the prosecution's theory, they were recovered in the living room near the area where Klein was. And it's further important to understand that those .22 caliber shells that were recovered, along with the slug that was recovered from the victim, were consistent with the .22 ammunition and clip that were later discovered in Richter's home. No, I do think we have read the record and everything you've said in the three minutes you've taken. I think we all know. Okay. Do you want to get to a point? Well, yes. What is the point of all this? The point of this is that in light of these facts, it's, if not obvious, it's very apparent that both of these defendants did enter the house and they were both armed. And, therefore, that Richter's story simply doesn't hold water, that he was simply waiting outside an innocent bystander while Branscombe went into the house simply to return some money that was owed to a third party. But, counsel, the government's obligation is to convict this Mr. Richter beyond a reasonable doubt. Is there any question in your mind that had testing been done of the blood pool, not on the doorway, but on the blood pool, and had some of Mr. Klein's blood been identified, that the prosecution's theory of how this occurred would be unviable? The prosecution's, in that one respect, if it could be substantiated, and it hasn't been. Well, again, it's your obligation to substantiate. You have to prove to the jury beyond a reasonable doubt what happened, right? Well, no, you have to prove that a robbery and a murder took place, but every single detail of that doesn't necessarily have to... I understand that, but my point is just simply that the defense has alleged that this was a gross, ineffective assistance of counsel, and they pointed to two different things. One of them is the blood pool, which apparently neither the state nor the defense bothered to check. But what I wanted to understand from you is, at least as to that one point, the state alleged that Mr. Klein was killed on the couch. He never... he was asleep. They shot him when he was asleep. He never could have been there, so if there was blood on the floor by the door in the blood pool from Mr. Klein, the state's theory, at least, would have been palpably incorrect. Isn't that right? It may have been correct as to that particular point, but... Okay, but if that turned out to be correct, and if there were evidence that, in fact, there was a .380 caliber bullet hole in the floor, which would further disprove what it was that the prosecution alleged, wouldn't that possibly raise doubt in the mind of the jury as to whether this man was guilty of murder beyond reasonable doubt? No, it wouldn't, and that brings me back to the first point I was making, because no matter what allegation of ineffective assistance here, and assuming there might have been some way to discount some portion, and I don't concede there was, but if there may have been some method of discounting some portion of the prosecution's theory, there's simply no way to get around the fact that Mr. Klein was killed with these two separate weapons, and there's... Counsel, you're forgetting that there was a theory of the case that this was self-defense, and that would take it from first-degree murder down to, I don't know what, you would know better than I, but yes, all those facts are there, as Judge Kaczynski pointed out, but we're talking about how it came to transpire, and whether, in fact, Richter's guilty of murder. Well, and if the jury found, and of course they did find, they may have expressed finding, in fact, that Richter personally used a firearm in this case, and... Is that enough? No, the point I'm trying to get at is that this evidence that Klein was killed by the two guns defeats their claim of Was that what the prosecution argued at trial, at their trial? Was that the prosecution's theory of the case at trial? The two weapons? Yeah. Oh, yeah, that was one of the cornerstones of the prosecutor's argument, that there simply is no way of getting around the fact that this victim was killed by two weapons, and there's no allegation. Why was it so important during the trial for the prosecutor to send Maloney out to the house to go look for other bullet holes? Well, the prosecutor was being very cautious. This prosecutor was a very conscientious prosecutor, and in the midst of trial, he wanted to do everything he could to... Was he so conscientious that he sent out an investigator who misidentified the bullet hole and then lost it? Well, we don't know that he misidentified the bullet hole, Your Honor, respectfully. Well, I thought we did know that. I thought subsequent examination has demonstrated that the bullet hole was, in fact, a .380, from a .380. Well, that hasn't been established. That's simply a matter of expert testimony, and there's other expert testimony that the bullet came from a .22. No, we're talking about the hole. Your testimony about what the bullet hole... I'm sorry, the hole came from a .22. So basically what we have here is competing expert testimony. So that establishes that at some point, Johnson had a .22, if I can accept your theory. At some point, and it was... It was a .22 in this house on the night of the shooting. That's correct. Was there any evidence that there was marijuana in the house at the night of the shooting? Didn't he take that out and dump it? Yes, he did. And you don't think if he had fired the shot and... shooting at Branscombe, and the shot had hit Klein instead, that he would have disposed of the .22? I think that it would be likely that the weapon would have been recovered, and it's... I don't know what ultimately became of the scale and the other marijuana that was... Well, my only point is you're assuming... I mean, on one hand, you're saying you're trying to prove Johnson was the source of a .22 hole in his house, and yet there was no... and that Klein was killed with a .22. There's an obvious link there that one would want some explanations. How could Johnson have shot a .22 in his house at some point, created a hole in his floor, and not also have shot a .22 on the night of the murder, hit Klein by accident, and then disposed of the gun? Because, Your Honor, first of all, there's two questions. First, quickly, it was undisputed that Johnson was a gun enthusiast, a gun nut, and had acquired, traded guns in the past, but more importantly, as I said at the beginning, there was no indicia of any cartridges found anywhere in the room, and it was undisputed that that's where Johnson was the whole time of the shooting. The evidence of the .22 shells were out in the living room, where Johnson was lying. That's not entirely true, but I understand after the shooting that Johnson had run of the house. Johnson moved from his bedroom to the living room. Is there any reason he couldn't have picked up the .22 cartridge and put it in the living room? To believe that, you have to believe that after being shot in the face and being shot with a severed artery, he had the presence of mind to find both of the cartridges. Well, he had the presence of mind to go outside and dispose of marijuana. Yeah, and he was obviously panicked. I see. But if he had mistakenly shot his friend, he wasn't panicked enough to try and frame somebody else, but he was rational enough to go out and take the marijuana outside. And that's, respectfully, Your Honor, a very, very far-fetched proposition. That's what juries are for, to decide whether or not the theory is too far-fetched. And that's why we're here, to make a determination. And, again, let me emphasize, this is an AEDPA case. You're arguing harmlessness? Is this what's going on? Yes. Yes, I am. I'm arguing that under the second policy. You're conceding ineffective assistance of counsel? Your Honor, if this weren't an AEDPA, no. The short answer is no. Are you going to argue that? Pardon me? Are you going to discuss ineffective assistance of counsel? Well, let me put it this way. If this were a de novo review, I would say that some of the things that counsel did in this case would be a close call. But this isn't. And so the deference has to be paid to the state court determination here that counsel's decision did not fall beyond all range of professional assistance. Counsel, help me on a detail that keeps nagging at me. You were talking a moment ago about cartridges. And I couldn't – the cartridge is the brass, the lead, the primer, and the powder. It sounded from the context as though you might be meaning to talk about the brass. The semi-automatic kicks out the brass each time it fires. The revolver doesn't. Correct. I can't tell what you were saying because you used the word cartridge and you used the word bullet, which may refer just to the lead, but sometimes to the whole cartridge. I don't know what you're talking about. I wasn't as precise as I should have been. I'm talking about spent cartridges that were discovered in the loot. Spent cartridge? Correct. Do you mean the brass? The brass, yes. The brass, the ejected brass. Okay, so where was brass found and where wasn't it found? It was not found anywhere. No .22 brass was found anywhere in the bedroom area. It was found out in the living room area near the area where Klein was dead on the couch. And that brass was consistent with match. It was the same type that was later found at Richter's house in an automatic weapon clip of the sort that would eject. When you say type, do you mean brand or some unusual type of ammo? Yes. Yes, I think they were called that. You were given an option. It's either brand or type, and you said yes. Oh, well, it was a particular brand. I think it was a special Stinger .22 ammunition, and that was specific to, I guess, this sort of weapon. I'm not an expert in firearms, but I do know what the record said, and the record said that this ammunition was the same as that that was found in the clip of the .22 weapon. Was the lead ever recovered that went under the house? Pardon me? Was the lead ever recovered that was under the house? No, it was not, Your Honor. Because we know there was a bullet hole in the floor of some sort, right? That's correct. And the only way you can make a bullet hole in the floor is by having a lead travel either. . . We assume there was no one in the call space shooting up, but there had to have been somebody in the room shooting down. So to find a bullet hole, you would expect that somewhere under that house is some lead that must have passed through to make the bullet hole. It would be safe to assume that someplace probably in the dirt buried underneath that house or maybe even on top of the dirt someplace is a bullet hole. In a murder case, this is not the kind of thing that the state investigates. They have a crime scene. I mean, it's very different from what we see on television, where they mark everything and they dig and they sift through the sand and look for ammunition. I guess that doesn't happen. You've got wounded and dead bodies and bullet holes and nobody bothers to go under the house and find a bullet. If you're asking if the prosecution had some sort of obligation to do that. . . I was actually just asking a fact, and the fact is they didn't bother to look. They didn't. . . It was the investigator's opinion, I guess, that the area underneath the house was inaccessible. No, they didn't bother to look there. The defense didn't either, and the prosecution . . . Well, the defense didn't bother to do very much there. Pardon me? The defense didn't bother to investigate at all because one theory, they thought their client was guilty. Oh, I have no way of knowing what Mr. Axsop . . . Well, the fact that the defense didn't investigate doesn't seem to prove very much in this case. I think that . . . Your Honor, I don't think that there's anything to support that assertion that Mr. Axsop thought his client was guilty and therefore softballed the case or didn't investigate for that reason. Well, I guess that was one theory I heard that the defense counsel was questioned about, is that you don't look because you don't believe your client. Right, but there's no evidence that that's what happened in this case. No, that's what I thought. Yeah, and I don't know what Mr. Axsop's subjective belief about his client's guilt was or was not, but I want to get back to this. We're talking about prejudice here. Well, you were suggesting that because the defense counsel didn't bother to go look at the bullet hole either before it fell through the cracks or afterwards, that that was significant. I'm suggesting that it doesn't matter in this case because there's no reasonable chance . . . At the very least, the state court reasonably determined under Strickland that there wasn't a reasonable likelihood that the outcome would have been different. How about the blood spatter evidence? Is there a reasonable likelihood that that might have changed the outcome? Not based on anything that we have here. And, you know, actually I've been giving a lot of thought to that. Even if it could be proven somehow that the prosecution's theory in that respect was wrong, there still is no reasonable likelihood that . . . Even if it could be shown that some of that blood, most of it, all of it was Klein's, it doesn't . . . there's still no reasonable likelihood that the result here would have been different. There's any number of scenarios to explain . . . What scenario do you have? If all of the blood was Klein's, then what theory does the state have? Oh, any number of them. I'd just like to hear one. Okay, one is . . . I'll give you two. I'll give you two. The first one is that . . . and, again, let me say these theories are at least as plausible, if not far more than the far-fetched theory presented by the defense here. One is that we know that the gun safe was removed from the room. We also know that Johnson was in the bed. He was shot down. He wasn't a precipient witness to what happened after he was shot. How do you explain Klein's blood in a place where he wasn't shot? I'm getting to that. He may have . . . I'm suggesting that it's possible he was shot there. I don't think he was. I think the prosecutor was absolutely right. But even if he was shot there, it seems far more reasonable to believe that he was shot by Richter and Branscombe there in the hallway and that they moved his body because, after all, they had to take this big cumbersome gun safe out. And if he was lying there bleeding on the floor, he'd obviously have to be moved to facilitate moving the gun safe out of the room. That's certainly one possibility. Another possibility is that he was at the door of the bedroom and Johnson shot him by mistake. But there's no evidence to support that because, if that were the case, you'd expect to find a .22 someplace in the house. You'd expect to find a cartridge someplace in the room. You certainly wouldn't expect that the cartridge that was found outside would miraculously match the ammunition that was later found at the house. And, you know, furthermore, back to prejudice on this, what would the jury have to accept to accept Richter's story here? Again, he wasn't a precipient witness, according to his story, of most of the events in the house. He was outside. He was the good friend of Johnson, not Branscombe. They had been at the house earlier. He could have given, if he wanted to drop off the money owed to the third roommate, he could have done that earlier. He didn't have to come back at 4 a.m., armed, and send somebody in. And according to his own testimony, the plan was, well, we'll just drop by at 4 a.m., armed, to return some clothes and some money. You can't wait until tomorrow. And if this fellow is there, fine, we'll drop it off. If not, we'll just leave. That's his testimony. And so, according to his testimony, Kline answers the door. Hi, is the roommate here? No. So did he turn around and go? No, he goes in and goes into the bedroom. What reason would he have to do that if any portion of this story held water? It's far-fetched from the get-go. But you're still not answering Judge Bybee's question, though. If it's just Kline's blood there, doesn't that, at the very least, raise the question of the degree of murder involved here? Maybe it was second or some other manslaughter or something like that, rather than first-degree murder. If, in fact, that's Kline's blood, because it does tend to substantiate the self-defense, at least raises the issue for the jury. Isn't that true? I suppose it would provide some sort of support for that. And isn't there a difference in the penalty between, say, second-degree murder and first-degree murder? Certainly there is. And I'm getting back to my point here, though. There's still no reasonable likelihood that the jury's determination would have been any different at all. But that's your subjection, and it's your burden to show, beyond a reasonable doubt, that a first-degree murder was committed here. No, actually, Your Honor, it's the defendant's burden to show that the state court's determination of this showing of any type of assistance. I'm talking about the original trial. That was your burden, not right now. And under any one of these scenarios, the evidence would have been overwhelmingly sufficient to meet that burden in this case, because the defense- Has any state court issued a reasoned decision on the ineffective assistance of counsel or the Brady claims? Has any state court? Right. Even in a different case? In this case. Was there a reasoned decision? No, no. It was a silent denial by the state court. We don't really know. We know the claims were denied, but we have no idea why. Well, we know that at the very, very least, there had to be a finding that the defendant was not prejudiced. How do we know that? Either that or that there was no ineffective assistance. But then we review the whole record to see if either of those was objectively unreasonable. Objectively unreasonable, yes. So what do we defer to? I'm sorry. What do we defer to? If we don't know whether they went off on lack of effectiveness or they were off of prejudice, a lack of prejudice, what do we defer to? You have to defer to their finding, period. No finding. I mean, in order to find that they were, that the state court was unreasonable here, you would have to find that the state court was unreasonable as to both prongs in order to grant relief. I thought that the standard of review when there's no finding by the state court is de novo. No, no, Your Honor. As established by this court, because this was still a merits determination here by the state court, albeit a silent one, and as established. What case is when they just deny it without any explanation? A silent denial? Well, I think that this. That on review here, we give deference to something? I think the line of case is starting with Delgado. No, no, that's not right. What it is, is if they haven't given a reasoned decision, then we conduct an independent review of the record to determine whether the denial was objectively unreasonable. Right. That's the law. Yeah, and that's what I'm getting at. So there's not deference, because there's nothing to give deference to. We independently review the record, and then we make a determination as to whether it's objectively unreasonable. And perhaps I view it as a sort of a different way of saying sort of the same thing, but you're correct. You have to find that the state court's determination of this strict claim was objectively unreasonable. Oh, yes, but that determination we make without giving deference to anything. Well, because there's no reason to give deference to. But in other words, I'm saying this is not de novo review. It's not a situation where you sit with someone. It's a de novo review to determine whether the decision is objectively unreasonable. Right. And so, in other words, the ADPA still applies to this case. Oh, sure. But you're arguing, as I understand it, is that if you boil it all the way down to the last straw, that the California Supreme Court could have relied on it, and could have found that he was ineffective, but at least they had to find in any event it was non-prejudicial. Yes. And we would have to find that it was objectively unreasonable to conclude on this record that ineffective assistance, presumed ineffective assistance, was non-prejudicial. Yes. Right. And that's the point I'm trying to get to. And on this record, there's no basis. In fact, I'd even argue if this was de novo review, which it's not, that there's no chance that this defendant was prejudiced by anything, because the evidence of his guilt was simply so overwhelming. And going back to the point I made to begin with, this evidence that Klein was killed by the two weapons almost certainly forecloses his story, which was, as I pointed out, pretty incredible on its face. And if you have any questions concerning different aspects of these various claims of ineffective assistance, I'd be happy to answer those. I have a question on why would counsel raise the .380 pistol and talk about being shot if it wasn't shot? And I don't understand where the presence of the third gun comes in. We know there's a .22. We know there's a .32. But counsel starts out immediately talking in his opening argument about the .380. Well, he certainly has to explain away the fact that the .380 evidence was later recovered. And he still has to go along with the story that his counsel had. Wait, no, no. Counsel at trial. Counsel at trial. So there must be some truth to the presence of the third gun, the .380. And if so, what would be the reason for that gun being there other than that someone else was waving that weapon or discharging that weapon? Well, there's no question that Johnson had the .380. He testified that he had the .380 on his nightstand there to ward off a possible robbery. And, you know, that portion of the record, there's no dispute about that. There's also no dispute that after the shooting, Branscombe took the .380 with them and later disposed of it. So what we have here is, you know, they're supposedly acting in self-defense. They take the weapons. They dispose of the weapons. They don't call the police. On the other hand, you have Johnson, who immediately calls the police and tells a consistent story throughout. And the story is consistent with the evidence. As I said, the shell casings found in the living room, he was shot, supposedly shot, or he was shot in his bedroom. No .22 casings there to explain how he could have fired any shots there. And regarding, you know, I was thinking about this bullet hole in the floor, too, and why it was ineffective. And because this issue about the .22 weapon is so critical in this case. You know, the prosecution presented evidence, as you pointed out, Your Honor, that a .22 had actually been fired in this house at some point. It's at least a double-edged sword as to why you'd want to present evidence to show that that bullet hole was not a .22 hole. Instead, it was a .380 hole, because as you pointed out, it was already established that there was a .380 involved in this case. So it just seems odd to me. Did the prosecutor point out to the absence of a .380 bullet hole in his summation when he urged the jury to discredit the defense theory? That was one of the things he pointed out. So I don't know how you can say it's a two-edged sword. Well, no, I'm saying it's a double-edged sword. If you could show that a .380 was the source of that hole, then I suppose you could show that a .380 had been fired in the house at some point. But if you show that a .22 was the source of that bullet hole, you also prove up what you need to prove, which is that a .22 was shot by Johnson at some point in that house, and therefore he might have had one. The prosecutor could not have made that argument if the floorboard had been brought in and been shown to be a .380 hole. He could not have said, where's the bullet hole to back up the story. At least that much of the prosecution's presentation would have had to change, right? Well, that presupposes that it could be, in fact, proven that the hole was a .380 hole rather than a .22 hole. And I don't think that that's been proven. But ultimately, I don't think it matters because it was a very small component of the prosecution's overall case here. Is that a yes? Yes. Or no? Well, the prosecutor, he would have had to make a different argument. Whatever the evidence was, the prosecutor would argue that that proved guilt. Well, unless it was something that mitigated against guilt. Right, but he couldn't have made that argument. He might have come up with another argument, but that particular argument he could not have made. That portion of the argument would have been unavailable, but that was, again, a very small portion of the argument. But it was one that was made to the jury to show that the man was guilty because they didn't come up with the evidence. It was important enough to the prosecution to try to persuade the jury that that proved guilt. Well, it was one of the very many pieces of evidence that the prosecutor pointed to. It would have shown that the defense couldn't prove innocence because why didn't they bring in this evidence? It would have shown innocence. No, it wouldn't have shown innocence, Your Honor. It would have shown not guilty, but here they didn't produce the evidence. I'm suggesting it would have shown that he was not guilty. Then why did they argue the absence of the evidence to the jury? Why didn't the defense produce this? The defense didn't go get it. But, you know, this is very, very speculative. This is, I mean, it's one speculation on top of another on top of another. If the defense had acquired this evidence, if the defense had further proven, at which it hasn't, that this was a source of a 3-D, and then if the jury had accepted that that bullet hole was fired on the night in question, which is, again, very, very speculative, then that would have tended to corroborate the defense's theory here. It was only the theory. But as I think one of you pointed out earlier. Your time is up. Okay, thank you, Your Honor. You have three minutes left. Thank you, Your Honor. I have just a couple points to make. Judge Reinhardt, in response to the question you were kind enough to give me time on, a lawyer's duty to investigate exists independent of statements by the client. That's part of the ABA guidelines. We know from Strickland and Wiggins that ABA guidelines guide the analysis of Strickland. Moreover, in this case, not only is there no evidence that counsel thought his client was lying, it's just the opposite. He actually relied on those statements to make his opening statement, which makes his failure to present evidence even more egregious. Counsel suggested that evidence of the .380 and possibly even the blood pool was somehow, it's not undisputed. But it is undisputed. The district court here gave this state process. It said you can depose his experts, you can present your own testimony. And they did neither. So the evidence that it's a .380 and evidence of the blood pool, the satellite traps, is indeed undisputed in this case. There were a number of questions about prejudice of my colleague and certainly of me. And we both gave our respective positions and a couple of points I want to make. But the larger one is this. The court often hears the defense lawyer stand up and say it was a closed case and the state stands up and says it was overwhelming. They explain the evidence differently. I think one of the most useful indications is putting aside what my colleague and I have to say and look at what the jury did. The jury in this case, remember, if you believe Gunner, this case is over. The jury in this case deliberated somewhere between 14 and 16 hours over three days. They asked for three times they asked to have testimony read and twice they asked to be re-instructed on the law. And one of those requests for re-instruction was on attempted voluntary manslaughter. And this gets to your question, Judge Wardlaw. You said what happens if it's self-defense or, and under state law, of course, imperfect self-defense gets you to voluntary manslaughter. And so the jury was plainly, in asking for re-instruction on this theory, at least it looks like they were considering the self-defense theory. And, of course, all the evidence that counsel didn't present on the 380 and the blood pool goes to that precise theory. So, you know, we can bat it around. Counsel and I, we have before the court today. We'll do it afterwards. But ultimately, the jury deliberations, I think, are an objective way of assessing whether this was really an overwhelming case. Imperfect self-defense is where you think you're in danger, but you're mistaken. Is that correct?  It's where you honestly believe it. But, in fact, either you're incorrect about it or it's objectively unreasonable. Of course, if Johnson was shooting, even if Johnson was mistaken about why he was shooting, I mean, he thought there were, you know, it wouldn't be imperfect self-defense. It would be just plain old self-defense. From Johnson's perspective, perhaps, although maybe, as the facts could be developed, Johnson's belief was unreasonable. Ultimately, it isn't so much Johnson's belief as is relevant as is Branscom's. All right. Two more points about prejudice. Counsel spent a fair amount of time talking about the casing, the locations of the casings. And I just – I wish I had more time to go into it. I'll just in summary say this. Detective Bell testified that the location of the casings, the 22 and the 32 casings, was consistent with Pat Kline being shot in the doorway between the living room and the bedroom. He didn't think it was likely, but he said it was consistent with it. And the reason he didn't have a firm opinion on how relevant the casings were is he said casing analysis, there are extraordinary vagaries. Casings can bounce. They generally eject to the right, but they can bounce. They can be kicked. So you cannot draw firm conclusions as to anything from where a casing ends up. And finally, the comment counsel made about the miraculous nature of the coincidence that the ammunition found in Petitioner's house matched the 22 ammunition. And it was no coincidence and it wasn't miraculous. And let's take a step back for a minute and put it in context. All parties agreed that six weeks prior to this incident, Gunner Johnson had moved out of his home and had stored all his personal belongings at Petitioner's house, the safe, his ammunition, his guns, his crossbow, and his scoop equipment. All parties agreed that sometime in early December, Gunner went back to the house and took back some of his personal items and left some. And when police searched Petitioner's house that day, they found not only 22 ammunition, they found shotgun ammunition. Well, Petitioner doesn't have a shotgun. Gunner does. And so what obviously happened is that Gunner left some of his ammunition there. There's no reason for Petitioner to have shotgun shells. And so the idea that the 22 ammunition similarly found there matched is somehow a coincidence and miraculous. It's neither. It was Gunner's ammunition. Thank you. Thank you, Mr. Garnley. Thank you, Your Honor. Case as argued will stand submitted. We are adjourned. Thank you.
judges: Kozinski , Reinhardt , O'Scannlain , Kleinfeld , Silverman , Wardlaw , . Fisher , Paez , Bybee , M. Smith, Ikuta